(No. 52956.—

JEAN GREENBERG *et al.,* Appellees, v. MICHAEL REESE HOSPITAL, Appellant.

*Opinion filed December 1, 1980.—Rehearing denied January 29, 1981.*

Lord, Bissell & Brook (Harold L. Jacobson, Williams P. Dorr, and Hugh C. Griffin, of counsel), and McKenna, Storer, Rowe, White & Farrug (John F. White, Robert S. Soderstrom, and James P. DeNardo, of counsel), all of Chicago, for appellant.

284

David S. Pochis. Ltd. (Alan D. Katz, of counsel), of Chicago, for appellees.

MR. CHIEF JUSTICE GOLDENHERSH delivered the opinion of the court:

Plaintiffs in these consolidated cases, Jean Greenberg, Laurel Deane Block Marshall, Joseph Weinberg, Bruce J. Shapin, Howard Dane, and Richard Kevin Ryan, appealed from the judgments of the circuit court of Cook County entered in favor of defendant, Michael Reese Hospital, upon allowance of its motions to dismiss and for summary judgment. The appellate court reversed (78 Ill. App. 3d 17), and we allowed defendant's petition for leave to appeal.

Plaintiffs, in their respective complaints, allege that at various times during the years 1941 to 1954 defendant provided each with therapeutic X-radiation treatments in connection with ailments of the tonsils, adenoids and adjacent tissues of the throat. Plaintiffs were children at the time of treatment and had been referred by their personal physicians to defendant for treatment. Subsequently, and by various means, each of the plaintiffs became apprised of the potential hazards attendant to such X-radiation therapy. It is alleged that by reason of the therapy each of the plaintiffs sustained injuries in the form of cancer, tumors or nodules in the tissues of the throat.

The complaints alleged three theories of liability: negligence, *res ipsa loquitur*, and strict liability in tort. Defendant moved to dismiss the *res ipsa loquitur* and strict liability in tort counts for failure to state a cause of action based on the facts alleged, and moved for summary judgment on the remaining negligence counts. The circuit court allowed all of defendant's motions. The appellate court reversed as to the strict liability and negligence counts, holding that the strict liability issue was controlled by

*Dubin v. Michael Reese Hospital* (1979), 74 Ill. App. 3d 932, and that the circuit court erred in entering summary judgments on the negligence counts.

In deciding the motions for summary judgment, the circuit court considered the affidavits of two expert witnesses and the discovery deposition of defendant's expert. That witness, Dr. Lionel Cohen, was an M.D. specializing in the practice of therapeutic radiology and was then chairman of the Department of Radiation Oncology at Michael Reese Hospital. In the brief affidavits submitted in support of the motions for summary judgment, Dr. Cohen stated that "based on a reasonable degree of medical and radiological certainty, the administration of X-ray therapy for hypertrophic lymphoid tissue in the pharynx was standard and customary and ordinarily used by hospitals and physicians" at the times in question. He also stated that at the times in question the state of medical knowledge did not include the "hazards of alleged resulting tumor developments of the thyroid gland."

In his discovery deposition, Dr. Cohen acknowledged that he presently believes that "radiation delivered to a child could increase the risk of developing thyroid cancer." He stated that the first "hint" of a correlation between thyroid cancer and childhood irradiation of the tonsils came in a 1950 medical journal article which reported on 28 cases of thyroid cancer (9 of which involved childhood irradiation of the thymus). Prior to the introduction of antibiotics, Dr. Cohen indicated, X-ray therapy was used and found to be successful for a number of ailments involving infections. Historically, he noted, free use of antibiotics was a phenomenon of the 1950's. In addition, the risks of surgery were greater at the times in question than at present. As a consequence, despite the unknown possible hazards of radiation, the "weight of the evidence seemed to be in favor of radiation treatment." Dr. Cohen

said that the main reason that X-ray treatment is not as "fashionable" now as it was in the past is that there are now "safer and more effective alternatives which didn't exist in the past."

Attached to plaintiffs' responses to defendant's motions for summary judgment were the affidavits of Eli A. Port, a "health physicist." At that time he had received a B.S. in physics and an M.S. in radiological health physics, and had completed work towards a Ph.D. in radiological health physics, including a dissertation on the subject of risks and benefits in pediatric radiology. In addition, Port indicated that he had a number of years' experience in the area of radiation safety, including work in connection with radiation therapy in hospitals. In his affidavits, he described health physics as "the science and profession dedicated to protecting man and his environment from the unwanted or undesirable effects of radiation."

Port said that at the times in question it was well known "that radiation might or could cause cancerous growths in the human body" and that "such knowledge was readily available to the radiological and medical community." He stated that this information should have been known to the defendant. Port also said that at the times in question the technology was available to shield tissue adjacent to areas being treated and that proceeding without such shielding was "an unsafe and hazardous practice." With regard to the hazards inherent in X-radiation therapy, plaintiffs' expert concluded that "based upon a reasonable degree of radiological and physical certainty" defendant should have known that the use of radiation included the hazard of tumor development in tissues adjacent to the tonsils, including the thyroid gland. Finally, Port concluded that at the times in question there were techniques available, including animal studies, which would have enabled defendant to ascertain the long-

term effects of irradiation and thereby determine the benefit and risk associated with radiation of the tonsils. He said that the failure to do so created a practice which was "unnecessarily hazardous."

Defendant first contends that the doctrine of strict liability in tort "should not be extended to the professional, medical decision to use X-ray therapy as an alternative course of patient treatment." We note that a similar argument has been presented by the defendant in *Dubin v. Michael Reese Hospital and Medical Center* (1980), 83 Ill. 2d 277. In determining that the doctrine of strict liability was applicable to the facts alleged here, the appellate court relied on the appellate decision in *Dubin* (74 Ill. App. 3d 932). There the appellate court, after analogizing to cases involving electricity, held that X-radiation was a "product" within the ambit of section 402A of the Restatement (Second) of Torts. It further held that hospitals which charge for X-radiation treatments were in the "business of selling" such treatments so as to render them strictly liable for injuries resulting from unreasonably dangerous defects in the product.

In support of its contention that strict liability should not apply to X-radiation therapy, defendant argues that "the public policy which generated the imposition of strict liability upon those who manufacture, sell and distribute consumer goods for commercial transactions and profit does not justify extension of the doctrine to those who render professional services, particularly medical services."

In *Cunningham v. MacNeal Memorial Hospital* (1970), 47 Ill. 2d 443, this court was required to decide the question whether a hospital was in the "business of selling" whole blood as that terminology is used in section 402A, or whether the transfusion of blood was a service so as to render inapplicable the doctrine of strict liability in tort. (47 Ill. 2d 443, 447.) In the context of that decision, quot-

ing *Russell v. Community Blood Bank, Inc.* (Fla. App. 1966), 185 So. 2d 749, *aff'd as modified* (Fla. 1967), 196 So. 2d 115, the court said:

" ' "It seems to us a distortion to take what is, at least arguably, a sale, twist it into the shape of a service, and then employ this transformed material in erecting the framework of a major policy decision." ' " (47 Ill. 2d 443, 450.)

Holding that the sale by a hospital of whole blood contaminated with serum hepatitis was not sufficiently different from the sale of other defective products to justify a departure from the rule of strict liability, the court said:

"We believe no logical distinction can be made between the facts alleged *** and those ordinarily involved in the dispensation of drugs and other medications by hospitals or other entities, where injury or disease resulting from the existence of deleterious contaminants therein would most assuredly result in the application of the strict liability theory." 47 Ill. 2d 443, 453.

In our opinion, whether, as held in *Dubin* (74 Ill. App. 3d 932, 939-43), X-radiation is physically analogous to electricity is in large part irrelevant to the policy considerations enunciated in *Suvada v. White Motor Co.* (1965), 32 Ill. 2d 612, which should determine the application of strict liability in tort to hospitals for administering X-radiation therapy. (See 74 Ill. App. 3d 932, 939-43.) Further, a number of additional considerations persuade us that *Cunningham* is not here controlling. Initially, it is to be noted that none of the plaintiffs allege the presence either of a "deleterious contaminant" or of other undesirable features of extraneous origin in the X rays. All plaintiffs except Richard Kevin Ryan allege simply that the X rays "manufactured" by the defendant were "hazardous and dangerous" in that they caused

tumors and cancer to develop. Plaintiff Ryan alleged that the treatments received by him "contained a condition which rendered them unreasonably dangerous" in that they "caused cancerous neoplasms," "contained excessive dosages of radiation," and "were not accompanied by any adequate warning." By comparison, in *Cunningham* the allegations centered on the particular containers of blood received by the plaintiff and the contaminants contained therein. Here, the plaintiffs' emphasis is not on the X-radiation but rather on the results of treatment. As such, plaintiffs' allegations go not so much to the defective nature of the particular X-radiation treatments in question as to the appropriateness of X-radiation treatment for plaintiffs' complaints. Indeed, plaintiffs do not allege any distinction between the X-radiation they received and all other X-radiation. Accordingly, we must conclude that the plaintiffs are concerned with the conduct of defendant rather than the nature of a particular product. In this regard this case differs markedly from *Cunningham*.

This court has long recognized a remedy for injuries resulting from negligent conduct in the sphere of medical practice. However, it has equally long been recognized that medical practitioners are to be held only to the standard of reasonable skill and are not expected to manifest the highest skill or insure a particular result. (See, e.g., *Ritchey v. West* (1860), 23 Ill. 329; *McNevins v. Lowe* (1866), 40 Ill. 209.) *Cunningham v. MacNeal Memorial Hospital* did not alter that rule in holding the doctrine of strict liability in tort applicable to the sale of containers of contaminated blood by a hospital. The holding of *Cunningham* was made especially clear in that regard by the emphasis given the fact that the blood in question was "physical material which was bad." See 47 Ill. 2d 443, 451, quoting *Perlmutter v. Beth David Hospital* (1954), 308 N.Y. 100, 111, 123 N.E.2d 792, 798 (Froessel, J., dissenting).

Viewing plaintiffs' allegations in light of the foregoing, we are of the opinion that they have alleged acts for which a sufficient remedy is already afforded in the law of negligence. We are unable to say that the allegations in question are sufficiently related to "physical material which is bad," to justify the application of strict liability principles, which are themselves focused on "products" and independent of articulated standards of conduct. See Restatement (Second) of Torts, section 402A, comment *a* (1965).

In *Suvada v. White Motor Co.* (1965), 32 Ill. 2d 612, 619, the court advanced as one of the principal reasons for the rule of strict liability in tort the "public interest in human life and health." This concept has its origins in cases discussing implied warranties. In *Wiedeman v. Keller* (1897), 171 Ill. 93, 99, for instance, this court dealt with the implied warranty of wholesomeness in food. There it was said, as justification for abrogation of the rule of *caveat emptor*:

> "Where *** articles of food are purchased from a retail dealer for immediate consumption, the consequences resulting from the purchase of an unsound article may be so serious and may prove so disastrous to the health and life of the consumer that public safety demands that there should be an implied warranty on the part of the vendor that the article sold is sound and fit for the use for which it was purchased." 171 Ill. 93, 99.

In cases involving goods and other tangible physical materials which are in some way bad, imposition of liability unquestionably enhances the public interest in human life and health. However, in cases which deal with the conduct of individuals or institutions which themselves are pledged to protect human life and health, precautions must be taken to avoid an ultimate diminution of protection. The possibility that in certain cases protection of

human life and health might be diminished by the imposition of liability has been recognized in section 402A of the Restatement. Comment *k* indicates that certain products, though dangerous, are necessarily so and do not warrant the imposition of liability. In amplifying on that aspect of 402A, Professor Prosser said:

> "The argument that industries producing potentially dangerous products should make good the harm, distribute it by liability insurance, and add the cost to the price of the product, encounters reason for pause, when we consider that two of the greatest medical boons to the human race, penicillin and cortisone, both have their dangerous side effects, and that drug companies might well have been deterred from producing and selling them." (Prosser, Torts 661 (4th ed. 1971).)

Professor Prosser and comment *k* presume in their treatments that the denomination "product" has already been applied to the matter in question. Nevertheless, imposition of strict liability is a question of policy, and often the same policy concerns are involved in discussions which are ostensibly diverse, for example: the meaning to be given such terms as "product," "defective," "unreasonably dangerous," and "business of selling." (See Restatement (Second) of Torts sec. 402A (1965).) For the reasons stated we conclude that public policy dictates against the imposition of strict liability in tort for injuries resulting from the administration of X-radiation treatments by a hospital.

Defendant next argues that, in reversing the summary judgment on the basis of the affidavit of plaintiffs' expert, the appellate court expanded the law of negligence so as to "modify the evidence required to establish a violation of the standard of care applicable to a hospital." Defendant contends that the appellate court's holding that plaintiffs' expert was qualified to testify contravenes this court's holding in *Dolan v. Galluzzo* (1979), 77 Ill. 2d 279. In that case we held that an expert witness, in order

to testify concerning the standard of care to be exercised by a podiatrist, must be licensed in the school of medicine of which the defendant was a member. (77 Ill. 2d 279.) The court said:

"The rationale of the general rule restricting expert testimony regarding the standard of care owed by a practitioner of a certain school of medicine is that 'there are different schools of medicine with varying tenets and practices, and that inequities would be occasioned by testing the care and skill of a practitioner of one school of medicine by the opinion of a practitioner of another school.' [Citation.] The practitioner of a particular school of medicine is entitled to have his conduct tested by the standards of his school." 77 Ill. 2d 279, 283.

Defendant reasons that inasmuch as Eli Port is not a practitioner of any school of medicine he should not be permitted to testify concerning conduct which involves a medical judgment. In *Darling v. Charleston Community Memorial Hospital* (1965), 33 Ill. 2d 326, this court was required to decide what evidence was admissible in determining the standard of care applicable to a hospital. There the defendant argued that the standard of care was determined by the custom of hospitals in the community. The court rejected custom as the sole determinant of the standard of care, saying:

"In the present case the regulations, standards, and by laws which the plaintiff introduced into evidence, performed much the same function as did evidence of custom. This evidence aided the jury in deciding what was feasible and what the defendant knew or should have known." (33 Ill. 2d 326, 332.)

It was also noted:

" '*** Present-day hospitals, as their manner of

operation plainly demonstrates, do far more than furnish facilities for treatment. They regularly employ on a salary basis a large staff of physicians, nurses and internes, as well as administrative and manual workers, and they charge patients for medical care and treatment, collecting for such services, if necessary, by legal action. Certainly, the person who avails himself of "hospital facilities" expects that the hospital will attempt to cure him, not that its nurses or other employes will act on their own responsibility.' (Fuld, J., in *Bing v. Thunig*, (1957) 2 N.Y. 2d 656, 143 N.E.2d 3, 8.) The Standards for Hospital Accreditation, the state licensing regulations and the defendant's bylaws demonstrate that the medical profession and other responsible authorities regard it as both desirable and feasible that a hospital assume certain responsibilities for the care of the patient." (33 Ill. 2d 326, 332.)

As *Darling* made clear, a modern hospital such as defendant is an amalgam of many individuals not all of whom are licensed medical practitioners. Moreover, it is clear that at times a hospital functions far beyond the narrow sphere of medical practice. Accordingly, while various medical judgments are necessarily a daily part of hospital administration, they do not constitute the entirety of a hospital's function, as is the case with single medical practitioners. Thus, we deem it appropriate to the diversity inherent in hospital administration that a broad range of evidence be available to establish the applicable standard of care. While plaintiffs' expert is not a medical practitioner, he is nonetheless highly qualified and familiar with radiation therapy in hospitals. We hold that the rule of *Dolan* is inapplicable to the facts of this case.

We are not confronted with nor do we here decide the question whether Port's testimony, assuming that it will

conform to his affidavit, is sufficient to show defendant's failure to exercise the necessary degree of care. We hold only that it is sufficient to raise a genuine issue of fact concerning the matters to which Dr. Cohen testified in his deposition and to which he referred in his affidavits.

Defendant next contends that "the standard of care for doctors and hospitals should be the same," and relies on *Dolan* and *Walski v. Tiesenga* (1978), 72 Ill. 2d 249, for the proposition that expert medical testimony is the only acceptable testimony for establishing that standard. In *Walski* the plaintiff's medical experts failed to testify that the defendant physicians breached the applicable standard of care. There was no testimony offered by a nonmedical expert and no hospital was involved. Accordingly, we find *Walski* inapplicable to the facts of this case. As we have indicated, both in *Darling* and here, the standard of care applicable to a hospital may be proved via a number of evidentiary sources. The appellate court correctly reversed the summary judgment entered by the circuit court.

Finally, plaintiffs argue that the circuit court erred in dismissing certain counts because the administration of the X-radiation here was within the exclusive control of defendant, and the doctrine of *res ipsa loquitur* should apply so as to require defendant to explain the injury resulting from the radiation. Plaintiff contends that these cases are analogous to radiation burn cases wherein the doctrine was applied. See, *e.g., Holcomb v. Magee* (1920), 217 Ill. App. 272; *Johnson v. Marshall* (1926), 241 Ill. App. 80; *Adamsen v. Magnelia* (1935), 280 Ill. App. 418; *Shockley v. Tucker* (1905), 127 Iowa 456, 103 N.W. 360; *Jones v. Tri-State Telephone & Telegraph Co.* (1912), 118 Minn. 217, 136 N.W. 741.

The circuit court declined to apply *res ipsa loquitur,* saying in its memorandum opinion:

"[W]ithout the benefit of medical expert testimony, it

is concluded that the knowledge in this case would certainly fall outside the scope of the knowledge of a layman. Therefore the counts based on *res ipsa loquitur* are dismissed and it is so ordered."

In *Walker v. Rumer* (1978), 72 Ill. 2d 495, we said: "The requirement for the application of the doctrine of *res ipsa loquitur* is not that the [medical procedure involved] be 'commonplace' or that the 'average person' be able to understand what is involved; the determination which must be made as a matter of law is whether 'the occurrence is such as in the ordinary course of things would not have happened' if the party exercising control or management had exercised proper care. That determination may rest either upon the common knowledge of laymen or expert testimony." 72 Ill. 2d 495, 500.

The allegations on which plaintiffs' *res ipsa loquitur* arguments are founded are as follows:

"3. That the Defendant, MICHAEL REESE HOSPITAL AND MEDICAL CENTER, a corporation, were in the sole use, possession, operation, maintenance and control of said x-ray machines, appurtenances and the dosages and the frequency of the dosages to be administered through the said x-ray machine and appurtenances; that said x-ray machine, appurtenances and dosages and frequency thereof if administered might or could produce cancer or cancerous conditions in the person of the plaintiff; that such applications of said x-rays were carelessly, negligently, done and performed.

4. That by reason of said negligence in connection with the x-ray machine, appurtenances and dosages the plaintiff was caused to get cancer."

In *Walker*, by comparison, the plaintiff alleged:

"(5) That from July 18, 1974 and thereafter, the plaintiff and all instrumentalities were under the exclusive control, care, custody and supervision of the defendant;

(6) That while the plaintiff was under the exclusive

control, care custody and supervision of the defendant, the plaintiff in some manner unknown to her sustained severe and permanent injuries to both of her hands;

(7) That said injuries were the result of careless- ness and negligence of the defendant; ***." (72 Ill. 2d 495, 498.)

These allegations were held sufficient to state a cause of action based on *res ipsa loquitur.* In this case as in *Walker,* we are unable to say that no set of facts can be proved which will entitle plaintiff to recover. (*Winnett v. Winnett* (1974), 57 Ill. 2d 7; *Miller v. DeWitt* (1967), 37 Ill. 2d 273.) Accordingly, the circuit court erred in dismissing the counts in question.

For the reasons stated the judgment of the appellate court is affirmed in part and reversed in part and the causes remanded to the circuit court of Cook County for further proceedings.

*Affirmed in part and reversed in part and remanded.*