Rachel **WETHERILL**, Plaintiff,

v.

**UNIVERSITY OF CHICAGO and Eli Lilly and Company, Defendants.**

Maureen **ROGERS**, Plaintiff,

v.

**UNIVERSITY OF CHICAGO and Eli Lilly and Company, Defendants.**

**Nos. 77 C 1434, 77 C 2485.**

United States District Court, N.D. Illinois, E.D.

June 17, 1983.

Paul F. Stack, Mark D. DeBofsky, Stack & Filpi, Chicago, Ill., for plaintiffs.

Lane D. Bauer, Steven C. Parrish, Stephen E. Sheve, Shook, Hardy & Bacon, Kansas City, Mo., for defendant Eli Lilly and Co.

John Menk, John Menk & Associates, James W. Gladden, Jr., Judith Janssen,

Mayer, Brown & Platt, Chicago, Ill., for defendant University of Chicago.

### MEMORANDUM OPINION AND ORDER *

SHADUR, District Judge.

Both Rachel Wetherill ("Wetherill") and Maureen Rogers ("Rogers") allege they were injured by exposure *in utero* to diethylstilbestrol ("DES"), manufactured and supplied by Eli Lilly and Company ("Lilly") and administered to plaintiffs' mothers as part of an experiment conducted by Dr. William Dieckmann ("Dieckmann") in the early 1950s at the University of Chicago ("University") hospitals. Each Complaint contains the same three counts:

1. Count I charges University committed a battery by subjecting the plaintiff's mother to the DES experiment without her prior knowledge or consent.[1]

2. Count II sounds in malpractice, asserting various acts of negligence by University and its hospital employees.[2]

3. Count III seeks recovery against University and Lilly on strict liability grounds.

All parties have deluged this Court with motions in limine in each case:

1. Lilly's motion to exclude evidence as to changes in Lilly product literature after plaintiffs were exposed to DES;

2. Lilly's motion to exclude cancer-related testimony;

3. University's motion to exclude colposcopic photographs;

4. University's motion to exclude an Abbott Laboratories document;

5. University's motion to bar plaintiffs from calling Dr. Vaux as an expert witness;

6. plaintiffs' motion to exclude cumulative testimony of defendants' expert witnesses; and

7. Lilly's motion for separate trial. This memorandum opinion and order will address each motion in turn.

### Changes in Lilly Product Literature After Plaintiffs' Exposure to DES

Wetherill and Rogers intend to introduce four DES publications printed by Lilly after plaintiffs' births (November 16, 1951 and May 26, 1952, respectively):

1. Lilly's 1954 A-form publication,[3] which mentions several researchers opposed to the use of DES during pregnancy;

2. Lilly's 1967 A-form, which acknowledges "possible adverse reaction on the fetus";

3. Lilly's 1972 A-form, which says a "statistically significant association has been reported between material ingestion of DES during pregnancy and the occurrence of vaginal carcinoma in the offspring"; and

4. Lilly's 1975 A-form, which warns that "vaginal adenosis has been reported in 30 to 90 percent of post pubertal girls and young women whose mothers received DES or a closely related congener during pregnancy."

---

* After this opinion had been fully prepared, plaintiffs' counsel moved on June 7, 1983 to dismiss Eli Lilly and Company as a defendant. No order has yet been presented for that purpose, but it appears to represent a firm decision by plaintiffs (though Lilly has moved the dismissal be with prejudice). Because it is not yet clear to what extent Lilly's former evidentiary concerns will now devolve on the University of Chicago (as for example in the area of expert testimony), this Court is issuing the opinion "as is"—though the opinion may perhaps be rendered only advisory to the extent any issues are rendered moot by Lilly's dismissal.

1. Count I originally named Lilly as well. This Court's October 27, 1981 memorandum opinion granted Lilly summary judgment on that count.

2. Count II also appears originally to have been directed against Lilly as well as University. Nonetheless the parties' memoranda on Lilly's motion for separate trial presume Count II's inapplicability to Lilly.

3. Lilly's "A-form publications" are monographs enumerating the indications and contraindications of its drug products. Typically an A-form cites relevant medical articles on the drug to support assertions in its text. This opinion will use the term "A-form" to refer specifically to A-form publications concerning DES.

Characterizing those increasingly ominous warnings as "subsequent remedial measures," Lilly moves under Fed.R.Evid. ("Rule") 407 to exclude all evidence of changes in its DES literature after plaintiffs' births. Alternatively Lilly calls for exclusion under Rule 403.

Rule 407 provides:

When, after an event, measures are taken which, if taken previously, would have made the event less likely to occur, evidence of the subsequent measures is not admissible to prove negligence or culpable conduct in connection with the event. This rule does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving ownership, control, or feasibility of precautionary measures, if controverted, or impeachment.

Plaintiffs disclaim any intention of using the post-occurrence[4] Lilly product literature as evidence of Lilly's "negligence or culpable conduct." Rather plaintiffs would introduce all four documents for "another purpose":

1. Lilly's 1954 A-form would be tendered to establish its knowledge of DES's dangers before plaintiffs' births—a claimed issue of "feasibility"—or alternatively to impeach the testimony of Lilly personnel who disavow any such knowledge before those dates.[5]

2. Three of them—the 1967, 1972 and 1975 A-forms—would be offered to prove the causal relationship between DES ingestion by a pregnant woman and injury to her offspring.[6]

■ Lilly's 1954 A-form does not fall within Rule 407's "feasibility" exception,

for that issue is not controverted by Lilly. *See Oberst v. International Harvester Co.,* 640 F.2d 863, 866 (7th Cir.1980) (evidence of subsequent remedial measure not admissible on the issue of feasibility unless it is contested). Lilly does *not* deny it would have been feasible to place warning language in its pre-occurrence product literature—*if* it had possessed knowledge sufficient to issue such warnings. On that latter subject—Lilly's knowledge (or the reasonable forseeability) of DES's harmful properties—the parties are in sharp disagreement. But that issue does not implicate the concept of "feasibility" within the meaning of Rule 407. *Accord, Werner v. Upjohn Co.,* 628 F.2d 848, 855 (4th Cir.1980); *Schneider v. Eli Lilly and Co.,* 556 F.Supp. 809 at 811 (E.D.La.1983); *Keil v. Eli Lilly and Co.,* No. 75–7099, slip op. at 2 (E.D. Mich. July 3, 1980); *Needham v. White Laboratories,* No. 76 C 1101, slip op. at 4 (N.D.Ill. Aug. 13, 1979). *Contra, McAdams v. Eli Lilly and Co.,* No. 77 C 4174, slip op. at 5–6 (N.D.Ill. Oct. 6, 1981) (1954 A-form admissible in rebuttal or cross examination on issue of Lilly's knowledge during 1953 because "[f]easibility also embraces the factual basis upon which the [warning] change could have been made").

"Feasibility" of remedial measures, in the normal sense of the word, rather denotes whether it would have been practical to have employed them earlier. That is a matter far different from whether a claimed wrongdoer knew or should have known, but nonetheless did not employ, remedial measures earlier. That latter question concerns Lilly's culpability or negligence.[7] And Rule

4. This opinion uses "occurrence" to signify the point at which each plaintiff was exposed *in utero* to DES.

5. It is unclear whether plaintiffs also urge the admissibility of the other three A-forms on this ground. In any event, plaintiffs have not indicated how such late documents would be relevant to the issue of Lilly's knowledge during the early 1950s.

6. This Court presumes Lilly takes the same position it espoused before Judge Marshall of this District Court in *McAdams v. Eli Lilly and Co.,* No. 76 C 1101 and thus does not urge the

admissibility of the 1954 A-form on the causation issue. At any rate, it would be hard pressed to do so, for the 1954 A-form simply does not contain any admissions by Lilly on that score.

7. This conclusion is not affected by the strict liability underpinnings of plaintiffs' challenge to the adequacy of Lilly's warnings. Concededly negligence and strict liability cases involving defective *products* are analytically dissimilar to some extent. But in failure-to-warn cases involving unavoidably dangerous products (like DES), "[t]he standard for liability under negligence and strict liability is essentially the

407 by its very terms precludes the use of the 1954 A-form for that purpose.[8]

■ As for the other three post-1953 publications, Rule 407 surely does not foreclose their introduction as admissions by Lilly that prenatal DES exposure causes the type of injury suffered by plaintiffs. Because causation is analytically distinct from fault ("negligence or culpable conduct"), it is plainly "another purpose" for which evidence of subsequent remedial measures can be offered under Rule 407.[9]

In an effort to escape that conclusion, Lilly invokes *Werner*'s exposition of the policy underlying the exceptions to Rule 407 (628 F.2d at 857):

> Of course, exceptions must arise where the defendant attempts to make offensive use of the exclusion of this evidence. Thus, if the defendant denies ownership or control, contends that no such repair or improvement was possible, or makes statements conflicting with the fact of repair, then the plaintiff should be allowed to make use of subsequent remedial measures. As previously noted, the list of exceptions in Rule 407 is illustrative, not exhaustive, but each of the listed exceptions deals with situations where the defendant might gain a direct benefit over and above the fact of exclusion and it seems to us that new exceptions to the rule should follow this rationale if the policy behind the rule is to be protected.

But recognition of the added exception here is entirely consonant with the *Werner* analysis: Were Lilly to escape plaintiffs' use of

an admission regarding causation—a non-fault issue—Lilly would (not merely might) "gain a direct benefit over and above the fact of exclusion." It would surely realize such a "direct benefit" were its post-1953 literature rendered inadmissible as to causation as well as fault.

It might perhaps be urged *Werner*'s "direct benefit" and "offensive use" language was intended to cover only situations in which the subsequent repair evidence convincingly disproves defendant's position on a non-fault issue. But in effect that would convert Rule 407 into a crude version of Rule 403, balancing the probative value of the evidence on that particular issue against the risk of prejudice (the impermissible inference of fault). Even apart from the obvious superiority of Rule 403 for making that comparison,[10] two policy reasons militate convincingly against any such approach:

1. As the Rules are structured, Rule 402 says "All relevant evidence is admissible," in conjunction with which any specifically applicable Rule or Rules determine admissibility of evidence. Only when that has been done (independently of any countervailing factor) does Rule 403's comparative analysis come into play. It would distort the drafters' scheme of things to engraft another level of comparison into one specific Rule on admissibility.

2. Rule 403 mandates a major showing of prejudice ("substantially outweighs") to overcome the low threshold

---

same." *Werner*, 628 F.2d at 858. Regardless of which rubric is used to classify such cases, the central issue is whether the warning mentions the reasonably foreseeable harmful qualities of the drug. And that issue is principally one of fault (negligence or culpability).

**8.** Though this Court differs from Judge Marshall's treatment of "feasibility" in *McAdams*, it agrees with his approach (slip op. at 6) of deferring until trial any ruling on the admissibility of the 1954 A-form for impeachment purposes.

**9.** It is immaterial that causation is not among the exceptions specifically mentioned in Rule 407. Its use of the words "another purpose, such as...." confirms the list that follows is

illustrative, not exhaustive. *See Werner*, 628 F.2d at 856, 857.

**10.** Rule 403 is more finely tuned to do the job than Rule 407 would be in at least three respects:

1. Rule 403 aggregates the probative value of the evidence on every relevant issue, not just that in dispute.

2. Rule 403 specifically takes into account negative factors (jury confusion and cumulativeness of evidence) in addition to the potential for prejudice.

3. Rule 403 focuses on the specific case in which the problem is posed, while Rule 407 (if the *Werner* language were read as suggested in the text) would look at a typical case to determine prejudice.

of admissibility represented by Rule 401's broad definition of "relevance." Rule 407, in its suggested application, would turn the balancing process on its head, requiring a major showing of probative value to overcome a merely possible degree of prejudice.

It is true plaintiffs will undoubtedly offer evidence of scientific clinical studies on the causation issue. But they are also entitled to seek the potentially greater effect a jury may give an admission on the same topic by Lilly. If Lilly expects to contest the causation issue, it cannot complain of any probative value the A-forms may have on that score. And as for any claimed prejudice, appropriate jury instructions can guard against any possible consideration of the A-forms as evidence of Lilly's failure to give adequate pre-occurrence warnings.

In sum the 1954 A-form is out while the other three A-forms are in. If the situation develops differently at trial as to any of them, either party may seek reconsideration.

### Cancer-Related Testimony

Though neither plaintiff now suffers from any cancerous or pre-cancerous condition, each believes her prenatal exposure to DES will significantly enhance the likelihood of contracting cancer in the future. Each seeks damages for her fear of developing cancer, not for the increased cancer risk itself. To establish the reasonableness of those fears, each intends to introduce expert and lay medical evidence confirming the causal relationship between cancer and DES.

Lilly objects strenuously to admissibility of cancer-related testimony for two reasons. First and most important, Lilly contends plaintiffs' anxiety is not compensable under Illinois law. It therefore seeks exclusion of that evidence on relevancy grounds (under Rule 402). Specifically, Lilly argues:

1. Plaintiffs have failed to satisfy the two prerequisites to recovery for negligent infliction of fear of future injury. Lilly says the feared future injury (cancer) must be (a) reasonably certain to develop from (b) a present injury (a cancerous or pre-cancerous condition).

2. Plaintiffs' "cancer phobia" does not state an action for intentional infliction of emotional distress.

3. As defendant in a strict liability action, Lilly is not liable for emotional injury under Illinois law. *See Woodill v. Parke Davis & Co.,* 58 Ill.App.3d 349, 354–55, 58 Ill.Dec. 349, 354–355, 374 N.E.2d 683, 687–88 (1st Dist.1978), *aff'd,* 79 Ill.2d 26, 38, 37 Ill.Dec. 304, 310, 402 N.E.2d 194, 200 (1980).

Alternatively Lilly seeks exclusion of the evidence under Rule 403, claiming its inflammatory nature outweighs its probative value.

■ Lilly's first contention as to relevancy misperceives both preconditions to recovery for emotional distress. Neither reasonable certainty nor present injury is required.

As for "reasonable certainty," such a stringent requirement would distort traditional notions of proximate cause. That concept's touchstone—reasonable foreseeability of the claimed injury (in this case emotional distress)—merely demands a reasonable fear, not a high degree of likelihood, that the feared contingency be likely to occur. Such a lesser showing of reasonableness is borne out by the few cases on point. *See, e.g., Baylor v. Tyrrell,* 177 Neb. 812, 131 N.W.2d 393, 402 (1964) (anxiety about possibility of developing cancer "must have reasonable basis"); *Ferrara v. Galluchio,* 5 N.Y.2d 16, 19–20, 176 N.Y.S.2d 996, 997–998, 152 N.E.2d 249, 251 (1958) (to recover for emotional anguish, victim of excessive radiation treatment must establish a "basis for her mental anxiety" but need not prove cancer will develop). And the distinction is meaningful, for fears of future injury can be reasonable even where the likelihood of such injury is relatively low. *See Murphy v. Penn Fruit Co.,* 274 Pa.Super. 427, 418 A.2d 480, 482, 485 (1980) (upholding damage award for psychic injury even though plaintiffs' doctors were certain her fears of cancer, heart attack and premature death were medically unfounded); *Heider v. Employers Mutual Liability In-*

*surance Co. of Wisconsin,* 231 So.2d 438, 441–42 (La.App.1970) (emotional distress arising from 2% to 5% risk of becoming epileptic compensable); *Baylor* (fear that wound "might" develop into cancer is reasonable); *Ferrara,* 5 N.Y.2d at 22, 176 N.Y. S.2d at 1000, 152 N.E.2d at 253 (same).

■ As for the claimed need to prove "present injury," Illinois case law requires only a causal link between the fear of future injury and the physical *impact* (as distinct from injury) of defendant's tortious conduct.[11] For example *Rosenberg v. Packerland Packing Co.,* 55 Ill.App.3d 959, 962, 13 Ill.Dec. 208, 211, 370 N.E.2d 1235, 1238 (1st Dist.1977) said in denying recovery for emotional trauma negligently precipitated by defendant, who nearly collided with plaintiffs' car:

> Plaintiffs failed to state a cause of action under Count I for the negligent infliction of severe emotional distress since they failed to allege bodily injury *and* since there was no physical impact between the vehicles or upon the plaintiffs' persons.

As the conjunctive "and" suggests, a showing of physical impact will suffice. *Accord, Benza v. Shulman Air Freight,* 46 Ill.App.3d 521, 523, 5 Ill.Dec. 91, 92, 361 N.E.2d 91, 92 (1st Dist.1977) (denying recovery for emotional distress in circumstances virtually identical to *Rosenberg* on basis of defendants' contention "that Illinois does not permit recovery to a plaintiff who suffered emotional harm accompanied by bodily injury, absent a physical impact, as a result of negligence").[12]

Plaintiffs' claim of emotional injury meets both preconditions. First, their anxieties are assertedly reasonable because (1) empirical studies have found a causal relationship between DES and cancer and (2) any ordinary person (one regularly bombarded with DES information from a variety of scientific and lay sources) would harbor such fears. Indeed, plaintiffs intend to adduce the very evidence at issue to establish the reasonableness of their apprehensions. Second, their fears stem from their prenatal exposure to DES—the "physical impact" of defendants' allegedly tortious conduct.[13]

■ Lilly's second relevancy contention— plaintiffs' failure to state a claim for intentional infliction of emotional distress—is beside the point. Plaintiffs do not assert their cancer fears as the predicate for such a tort. Rather they seek recovery for their anxiety as an element of the damages flowing from a wholly different (and concededly well-pleaded) tort: the alleged inadequacy of Lilly's DES warnings.

■ Lilly's last relevancy assertion once again misapprehends the applicable law. No Illinois court has ever precluded a strict liability plaintiff from recovering damages for emotional harm arising from the physical impact of defendants' actions. *Woodill,* 58 Ill.App.3d at 355, 58 Ill.Dec. at 354–55, 374 N.E.2d at 687–88, the only case cited by Lilly, simply refused to extend strict liability to include recovery for emotional distress arising from physical injury to another.[14]

---

**11.** Because this is a diversity case, this Court will not explore the logic of requiring *any* physical touching, as distinct from permitting recovery for emotional harm alone. Whether the requirement stems from the courts' desire to minimize fabricated claims (given the fact claimed emotional distress depends so heavily on self-serving statements) or some other source, it is well-entrenched in Illinois law.

**12.** *Carlinville National Bank v. Rhoads,* 63 Ill. App.3d 502, 503, 20 Ill.Dec. 386, 388, 380 N.E.2d 63, 65 (4th Dist.1978) similarly stated:

> Illinois has long followed the view that there can be no recovery for negligent infliction of mental distress in the absence of some contemporaneous physical impact.

True enough *Carlinville* also employed the term "contemporaneous physical injury." But as

*Carlinville*'s discussion of the relevant case law confirms, the language was used in its broadest sense, to signify any sort of physical contact, and not to simply a strict temporal-relationship requirement (see n. 13 of this opinion).

**13.** Although Lilly has not made the point, this Court has noted the case law's reference to the physical impact as "contemporaneous" with the infliction of mental distress. Were that an essential element of the cause of action, plaintiffs obviously could not satisfy it. However, reading the authorities makes plain they demand only a causal nexus between the impact and the resulting fears, not temporal identity.

**14.** That proposition is well-settled in the negligence context; *see, e.g., Carlinville National Bank,* 63 Ill.App.3d at 504, 20 Ill.Dec. at 388, 380 N.E.2d at 65.

Even if recovery for mental anguish might be inappropriate in other strict liability cases, failure-to-warn cases couched in strict liability terms really require the same showing of fault as warning cases brought under negligence theories. There is no sound reason to bar recovery for emotional distress in strict liability warning actions while permitting such recovery in their negligence counterparts.

■ Finally, Lilly's attempted resort to Rule 403 as an alternative ground for exclusion fares no better. Plaintiffs' cancer-related evidence is obviously highly probative as to the reasonableness of their fears of developing cancer. As for the prejudice side of the scale, there is no real risk of a jury drawing an inappropriate factual inference. Contrary to Lilly's assertion, a causal link between DES and cancer may permissibly be inferred from such evidence, and the inference bears directly on the reasonableness issue. Any danger that a jury might award damages as compensation for the heightened risk of cancer rather than the ensuing emotional distress can be minimized by appropriate instructions.

Accordingly Lilly's motion to exclude cancer-related testimony must be denied.[15]

### Colposcopic Photographs

Wetherill intends to introduce at trial the January 22, 1982 videotape deposition of Dr. John Marlow ("Dr. Marlow"), a gynecologist who has examined Wetherill and diagnosed her injuries. In a two-minute segment of that deposition Dr. Marlow described one of Wetherill's claimed injuries (adenosis, an abnormality in the vaginal wall) by referring to a colposcopic[16] photograph depicting the condition in an unidentified woman.[17] That photograph, from Cartier's *Practical Colposcopy* textbook,[18] magnifies the actual subject matter to ten times its actual size.

University has moved to exclude both the photograph and the two-minute portion of the Marlow deposition under Rule 403, claiming their probative value is substantially outweighed by the danger of unfair prejudice and jury confusion because:

1. With no notion of what is "normal" vaginal tissue, the jury cannot determine the degree of "abnormality" portrayed in the photograph.

2. Ten-fold enlargement of the deformed cell structures gives a distorted impression of Wetherill's physical condition and the degree of her pain.

On the other side of the coin, the University depreciates the probative value of the photograph because it does not reflect Wetherill's own vaginal tissues.

Judges McMillen and Grady recently admitted colpophotographic evidence in two other DES cases, *Gwendolyn Mink v. University of Chicago*, No. 77 C 1432 (N.D.Ill. Mar. 8, 1983) (McMillen, J.) (reversing earlier ruling excluding such photographs); *Patsy Mink v. University of Chicago*, No. 77 C 1431, Tr. 255 (N.D.Ill. Feb. 16, 1982). Having reviewed the relevant authorities (as discussed in the rest of this section), this Court concurs with their determinations.

■ As a general proposition, courts and commentators support admissibility of photographs of another person's injuries when used for illustrative purposes, provided competent evidence is adduced to confirm the similarity of the depicted injuries to plaintiff's. *See Kershaw v. Sterling Drug, Inc.*, 415 F.2d 1009, 1111 (5th Cir.1969) (upholding admissibility of photographs and slides as demonstrative evidence in action

---

**15.** Judge McMillen rejected an identical motion in *Gwendolyn Mink v. University of Chicago*, No. 77 C 1432, slip op. at 2 (N.D.Ill. Dec. 20, 1982).

**16.** Colposcopy is the examination of the cervix and vagina through a magnifying lens, using an instrument designed for that purpose.

**17.** Wetherill's responsive memorandum continually refers to "photographs," even though University's motion concerns a single photograph identified in Dr. Marlow's videotape deposition. If other adenosis photographs were in fact included in that audio-visual presentation, this ruling extends to them as well.

**18.** Cartier is a renowned expert in colpophotography (the use of colposcopes for photographic purposes). Marlow Dep. 63.

for injuries sustained from drugs manufactured by defendant); *Thornburg v. Perleberg,* 158 N.W.2d 188, 192–93 (N.D.1968) ("Where a proper foundation is laid by the witness's testifying that a picture portraying [sic] the same conditions which he found in the plaintiff's case, it should be admitted in evidence for illustrative purposes even though it does not portray the plaintiff's own injuries"); *McCormick on Evidence,* Demonstrative Evidence § 214, at 530–31 (2d ed. 1972). *Cf. Georgia Southern & Florida Railway Company v. Perry,* 326 F.2d 921, 924 (5th Cir.1964) ("posed photograph is admissible when it is shown that it represents a correct likeness of the scene, object or person that it purports to represent, and the sufficiency of the preliminary showing rests largely in the discretion of the trial judge"). Dr. Marlow has testified the photograph "represents precisely" the adenosis condition he observed in Wetherill's vagina (Marlow Dep. 62), so that the requisite evidentiary foundation for admissibility has been laid.

■ Rule 403 does not render the evidence inadmissible. Its probative value is considerable, given Dr. Marlow's testimony it "represents precisely" Wetherill's injuries:

1. Only through such photographic evidence can the jury visually observe the condition from which Wetherill allegedly suffers.

2. It also facilitates the jury's understanding of Dr. Marlow's technical explication of Wetherill's complex gynecologic disorders.

By contrast, the spectre of prejudice and confusion raised by University is wholly unfounded:

1. Magnification of the photograph on the videoscreen will enhance the picture's utility as a visual aid, rather than inflame the jury.

2. Nor will the photograph likely induce the jury to exaggerate the degree of abnormality it portrays, for Dr. Marlow's

accompanying testimony lucidly identifies the deformed cell structures appearing in the depicted vaginal wall.[19]

University's motion to exclude the colposcopic photograph is therefore denied.

### Abbott Laboratories Document

Plaintiffs seek to introduce the Minutes of a January 19, 1950 Abbott Laboratories Medical Department Meeting (the "Minutes"), stating in pertinent part:

Dr. Dieckann [sic], of the University of Chicago, is somewhat skeptical of the report of Dr. Smith on the use of stilbestrol in complicated pregnancies. He would like to check this work on 1,000 cases to be treated with stilbestrol and 1,000 with a placebo. He has inquired as to our interest in supplying this medication and a grant.

University advances three grounds for excluding the Minutes from evidence:

1. They are inadmissible hearsay, qualifying neither under the ancient document (Rule 803(16)) nor the business records (Rule 803(6)) exception because their trustworthiness is suspect.

2. They are irrelevant.

3. Their probative value (if any) is outweighed "by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . ." (Rule 403).

■ University's third objection, which moots the second, has merit. Any probative value of the Minutes is slight for two reasons. First, their relevance hinges entirely on plaintiffs' strained reading of the quoted excerpt. If (as plaintiffs urge) the passage is to be viewed as expressing Dr. Dieckmann's skepticism over the *efficacy* of DES, it arguably bears on whether plaintiffs' mothers received (1) his best medical judgment and (2) enough disclosure for an informed consent to an experimental regime of DES administration.[20] But plaintiffs appear to read too much into this excerpt. To this Court the far more plausi-

---

**19.** To minimize any possibility of jury confusion, this Court will permit University to introduce into evidence a photograph of normal vaginal tissue.

**20.** That first issue is relevant to plaintiffs' malpractice claim, while the second is relevant to both that claim and the battery count.

ble sense of the Minutes is as reflecting Dr. Dieckmann's qualms as to "the report of Dr. Smith" (that is, its reliability)—hence the desire of Dr. Dieckmann to undertake his own scientifically valid DES study. To jump to the inference that Dr. Dieckmann doubted DES's beneficial qualities requires a leap of faith, not logic.

Second, a lack of assurance as to the Minutes' trustworthiness further detracts from their probative significance. Too many unanswered questions surround this 33-year-old document. Its author cannot be ascertained. More importantly, the Minutes do not reveal the basis for the comment as to Dr. Dieckmann's skepticism. Were such sentiments expressed by Dr. Dieckmann himself or merely surmised by some other unidentified person at Abbott? If the latter is the case, the probative value of the Minutes—even as interpreted by plaintiffs—is appreciably diluted.

Precisely because of their intrinsic ambiguity and lack of trustworthiness, the Minutes risk substantial prejudice and jury confusion. In *Mink v. University of Chicago,* 77 C 1432 (N.D.Ill. Feb. 16, 1982), a battery claim brought by plaintiffs' mothers, Judge Grady recognized this grave danger (Tr. 248):

> Skepticism, I suppose, can range from slight to extreme, and I just do not think that this memorandum is probative.

> On the other hand, simply because it is something that is capable of meaning all things to all people, it can be highly prejudicial. You could stand there in final argument and wave that memorandum and ask for $2 million, and maybe some people on the jury would think you are entitled to have it. But I do not think that that is the kind of evidence that would justify such a result.

> So because the prejudicial value or prejudicial impact of the document or the possible prejudicial impact in my view far outweighs its probative value for the rea-

sons I have indicated, I am going to exclude it under Rule 403.

Because the Minutes' arguable probative value is so far overshadowed ("substantially outweighed" in Rule 403 terms) by their tendency to prejudice and confuse the jury, this Court too will exclude them under Rule 403.[21]

### *Dr. Vaux's Testimony*

Each plaintiff intends to call Dr. Kenneth L. Vaux ("Dr. Vaux") as an expert witness to testify as to Illinois' informed consent standard: whether "the reasonable medical practitioner of the same school, in the same or similar circumstances, would have told the patient of such [foreseeable] risks" of the challenged treatment. *Green v. Hussey,* 127 Ill.App.2d 174, 184, 262 N.E.2d 156, 161 (1st Dist.1970). University contends Dr. Vaux cannot provide the requisite "expert medical evidence" (*Green,* 127 Ill.App. at 184, 262 N.E.2d at 161) because:

1. He was too young to have had personal knowledge of what reasonable physicians would have disclosed to a participant in University's DES experiment.

2. He is not a licensed physician.

Neither objection disqualifies Dr. Vaux as an expert witness.

Though bound by Illinois' requirement of "expert medical evidence," this Court looks to federal law—to the Rules—to determine Dr. Vaux's eligibility as an expert witness.[22] Rule 702 defines the test:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

■ That language reveals the poverty of University's first argument. By recognizing expertise gained through "training or education" as well as "experience," Rule

---

**21.** Judge Grady specifically ruled the Minutes' potential for prejudice eclipsed their evidentiary contribution to the battery claim alone. This Court's weighing of the Rule 403 factors is somewhat different, for the Minutes' impact on plaintiffs' malpractice claims must also be eval-

uated. In the end, though, the result is the same.

**22.** As the Illinois authorities cited in this section confirm, University's objections would enjoy no greater currency under Illinois law.

702 expressly permits expert witnesses to form their opinions by studying the work of others rather than through first-hand empirical observation. *See Grindstaff v. Coleman,* 681 F.2d 740, 742–43 (11th Cir.1982) (medical expert need not have been licensed at time of event at issue under Rule 702's disjunctive test); *cf. Mahr v. G.D. Searle & Co.,* 72 Ill.App.3d 540, 572–73, 28 Ill.Dec. 624, 657, 390 N.E.2d 1214, 1237 (1st Dist. 1979) (confirming the same proposition under Illinois law).

▉ University's second line of attack has slightly more substance but also fails to discredit Dr. Vaux's expertise. Whether University breached its disclosure obligation to plaintiffs' mothers involves three distinct inquiries:

1. whether its DES study was experimental or therapeutic;

2. whether there were undisclosed risks; and

3. if there were, whether then-prevailing ethical standards required their disclosure.

Because he is not a medical practitioner, Dr. Vaux concededly lacks the "specialized knowledge" to testify as an expert on the first two issues. But he is eminently qualified to speak to the ethical concerns raised by the third—and most important—issue:

1. Dr. Vaux is an Associate Professor of Ethics in the University of Illinois Department of Internal Medicine.

2. He is also a member of the Institutional Review Board of the School of Medicine, an oversight body that regulates the ethical aspects of medical experiments involving human participants.

**23.** University unpersuasively argues Dr. Vaux cannot testify as to the relevant ethical considerations without first speculating as to the foreseeable risks posed by DES in the early 1950s. To the extent such a predicate is required, plaintiffs' attorneys can provide it on direct examination in any of the conventional ways used in offering expert testimony: by posing hypothetical questions, by having Dr. Vaux hear courtroom testimony on the subject or in any other way permitted by the Rules.

**24.** As *Greenberg,* 83 Ill.2d at 292–93, 47 Ill.Dec. at 390–91, 415 N.E.2d at 395–96 also makes plain, Illinois law would not disqualify Dr. Vaux from presenting "expert medical evi-

3. He has written extensively in the field of medical ethics and experimentation.

With that impressive background (and assuming his testimony will address the relevant time period), Dr. Vaux certainly has the qualifications to testify as to the prevalent disclosure policies of hospitals that conducted medical studies similar to Dieckmann's at that time. *See Greenberg v. Michael Reese Hospital,* 83 Ill.2d 282, 292–93, 47 Ill.Dec. 385, 390, 415 N.E.2d 390, 395 (1980) (prevailing custom is but one of several determinants of the applicable standard of care in suits against hospitals, though it may carry dispositive weight in suits against individual doctors). Most significantly, Dr. Vaux is particularly well-suited—more so than the vast majority of physicians—to testify as to alternative sources of disclosure standards.[23] *See Darling v. Charleston Community Memorial Hospital,* 33 Ill.2d 326, 332, 211 N.E.2d 253, 257 (1965) (state administrative regulations and hospital standards and bylaws are evidence of appropriate standard of care).[24] Consequently University's motion to bar Dr. Vaux from testifying as an expert is denied.

### Cumulative Testimony of Defendants' Expert Witnesses

Plaintiffs have moved under Rules 104(a) and 403 to exclude cumulative testimony by defendants' expert witnesses. They rely heavily on footnote 5 of this Court's Final Pretrial Order: "Only one expert witness on each subject for each party will ordinarily be permitted."[25]

dence" because of his non-physician status—at least in a suit against a hospital. *See also Harris v. Groth,* 99 Wash.2d 438, 663 P.2d 113 (Wash.1983) (allowing trial court broad discretion to determine whether nonphysician is qualified to give expert testimony in malpractice cases).

**25.** That provision has as its obvious goal the avoidance of prolonged battles of the experts, with each side vying to present a longer parade of witnesses to overwhelm the jury. Of course it is not an unvarying rule (for example it would be unreasonable to present a jury with a single exponent of the flat-earth theory and one advocate of Copernicanism, creating a 50–50

### 1. Lilly's Expert Witnesses

Lilly intends to use three medical experts: Drs. Don Carlos Hines ("Hines"), Edith L. Potter ("Potter") and Joseph W. Goldzieker ("Goldzieker").[26] In the Pretrial Memorandum Lilly describes each expert's background and anticipated testimony:

1. Hines was a physician in Lilly's Medical Department during the relevant time period. In that capacity, he monitored Lilly's clinical investigation of DES, evaluated other available DES literature and prepared Lilly's application to the FDA for permission to market the drug. He is expected to testify as to (a) Lilly's clinical DES investigations; (b) the DES medical literature available during the period in question; (c) the then-prevailing medical opinion "about the relevancy of the animal experience with estrogens to the experience in humans"; and (d) the foreseeability of DES's impact on the human fetus.

2. Potter is an expert in the field of fetal pathology who worked with patients involved in University's experimental DES project. She is anticipated to testify that (a) she never associated any anomaly of the female reproductive tract with intrauterine DES exposure; (b) prevailing medical opinion prior to 1952 regarded DES as a safe estrogenic substance; and (c) animal experimentation with estrogen has no relevance to human medicine.

3. Goldzieker is an expert in the field of endocrinology and personally conducted animal DES studies. He will testify as to (a) "the state of animal testing during the relevant time periods . . . and the necessity of using a physiologically meaningful animal model in attempting to predict the effects of a drug in hu-

mans"; (b) the adequacy of DES testing; and (c) the foreseeability in 1952 of any causal link between DES and plaintiffs' claimed injuries.

Lilly's own summary of its experts' testimony thus reveals considerable redundancy. For example, all three witnesses are expected to testify as to (1) the relevance of animal DES studies and (2) the state of medical knowledge as to DES's cancer-related effects during the early 1950's.

Lilly's responsive memorandum glosses over this problem of cumulativeness by characterizing its experts' testimony more narrowly:

1. Because Hines was the physician primarily responsible for Lilly's R & D program concerning DES, "the basic thrust of his testimony will relate to Lilly's awareness and understanding of DES and the medical literature concerning it" (Mem. 3–4).

2. Potter's "testimony will be predicated to a substantial degree upon her extensive first-hand review of pathological material at the University of Chicago" (id. at 5). Such "pathological material" was described earlier as "abortuses, fetuses, stillbornes and neonates who had died, many of whom had been exposed to DES" (id. at 4).[27]

3. As the only Lilly witness who personally conducted animal studies, Goldzieker "will testify concerning the state of animal testing during the relevant time periods and the necessity of using a physiologically meaningful animal model in attempting to predict the effects of a drug in humans . . . [and] also will testify that DES was adequately tested" (id. at 6).

---

chance the trier of fact would be misled by a persuasive proponent of a thoroughly discredited opinion). But it surely serves as a sound principle to follow unless there are substantial contraindications.

**26.** Goldzieker will testify in person, while the Hines and Potter testimony will be presented at trial by videotape.

**27.** Lilly also states "because Dr. Potter was at the University of Chicago during the Dieckmann study, she can provide testimony concerning the planning of the study" (id. at 5). Such testimony cannot be allowed for two reasons:

1. It is irrelevant to Lilly's own defense.

2. University (to whose defense it would be relevant) plans to call an expert witness other than Potter to testify on that subject.

Plaintiffs concede the danger of cumulative testimony would be averted should Lilly's revised synopsis of their experts' testimony prove accurate at trial. They have therefore submitted a draft order incorporating those restrictive characterizations.

██ Plaintiffs' draft order is an eminently reasonable solution to the potential for duplicative testimony disclosed in the Pretrial Memorandum. By definition Lilly's ability to present its defense would not be impaired by confining its experts' testimony to the areas as to which Lilly intends them to testify.

#### 2. University's Expert Witnesses

██ University will rely on two expert witnesses, Drs. Mark H. Lepper ("Lepper") and Richard L. Landau ("Landau"). Here the Pretrial Memorandum indicates:

1. Lepper is an internal medicine practitioner in Chicago. He "will testify as to the practices for conducting medical studies in Chicago in 1950 to 1952."

2. Landau, also an internal medicine specialist, has taught at the University since 1946. He too "will testify as to the practices for conducting medical studies in Chicago in 1950 to 1952."

There is thus no doubt of largely repetitive testimony, a conclusion reinforced by University's failure to respond to plaintiffs' motions.

To eliminate such cumulative testimony, plaintiffs' proposed order would limit:

1. Lepper's testimony "to the practice in Chicago with regard to obtaining consent from persons being administered medication as part of a medical study" and

2. Landau's testimony "to the practice of obtaining informed consent at the University of Chicago when the Dieckmann study was conducted."

---

**28.** This case exemplifies the judicial economies afforded by a single trial, for the evidence to be adduced against both Lilly and University shows considerable overlap:

Even though such a division of testimony seems reasonable, it is neither plaintiffs' nor this Court's function to devise the allocation of testimonial responsibilities. University will be restricted to one expert for each area but will be allowed to make the selection itself.

#### *Motion for Separate Trial*

██ Lilly has moved under Fed.R.Civ.P. 42(b) to be tried separately on Count III. It seeks to avoid possible prejudice from exposing the jury to certain evidence admissible as to University but inadmissible as to Lilly:

1. evidence as to plaintiffs' fears of contracting cancer, admissible against University on a battery theory;

2. evidence bearing on University's liability for punitive damages on the battery count; and

3. depositions of expert witnesses Drs. Arthur L. Herbst ("Herbst") and Dr. Kenneth L. Noller ("Noller"), taken in a different proceeding to which University but not Lilly was a party.

Potential prejudice is indeed one of Rule 42(b)'s three independent grounds for invoking separability:

The court, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial of any claim, cross-claim, counterclaim, or third-party claim, or of any separate issue or of any number of claims, cross-claims, counterclaims, third-party claims, or issues, always preserving inviolate the right of trial by jury as declared by the Seventh Amendment to the Constitution or as given by a statute of the United States.

Because a single trial generally fosters judicial efficiency,[28] courts have ordered separate trials only when "clearly necessary." 5

1. Plaintiffs intend to present the same testimony against both defendants on Count III.

2. Each count poses identical issues (and hence identical testimony going to damages).

*Moore's Federal Practice* ¶ 42.03[1], at 42–37 to 42–38 & n. 4 (1982). Lilly's speculative assertion of prejudice falls far short of that stringent test.

Certainly the first two categories of evidence pose no discernible risk of prejudice:

1. Because plaintiffs' apprehensions of developing cancer are relevant under Count III, evidence on that issue is admissible against Lilly in any case.

2. Evidence bearing on University's intentional misconduct (in connection with its DES experiment) is unlikely to mislead the jury in determining Lilly's culpability on Count III. Such evidence is obviously irrelevant to Lilly's liability, and any arguable risk of jury confusion can be defused through cautionary instructions.

True enough, some risk of prejudice may be posed by the Herbst and Noller depositions. Their testimony would be relevant to at least two issues raised in Count III:

1. whether prenatal DES exposure is causally linked to cancer; and

2. whether that causal relationship was foreseeable in the early 1950's,

but it is inadmissible against Lilly under Rule 804(b)(1).

Despite that theoretical possibility of prejudice, the degree of danger is clearly not sufficiently grave to warrant a separate trial. In both qualitative and quantitative terms, the two depositions are a comparatively minor part of the evidence plaintiffs will marshal on the issues. Live testimony by plaintiffs' expert witnesses will be the bulk of such evidence. In practical terms it is likely to carry far more weight with any jury than an impersonal reading of the deposition transcripts. And again cautionary instructions can be fashioned to avert any possible prejudice.

Lilly's arguments to the contrary really prove too much. They would effectively preclude any trial involving multiple defendants whenever a relatively small amount of evidence admissible as to one defendant is both inadmissible and relevant as to another defendant's. That approach would emasculate the liberal federal approach to joinder of parties. As the court put it in *United States v. Kennedy,* 564 F.2d 1329, 1334 (9th Cir.1978) (affirming the denial of a motion for a separate trial under Fed.R.Crim.P. 14, the criminal counterpart of Rule 42(b)):

> It is not surprising that a defendant might prefer to be tried separately so that the only evidence admissible strictly against him would be heard by the jury. However, if this formed the only basis for prejudice required for severance, the consequent volume of separate trials of multiple actions in a series of similar and connected illegal transactions would create an intolerable burden on the trial courts. Serious consideration is properly to be given to the factor of judicial economy by the trial court in the exercise of its discretion when severance is sought.

*Kennedy* then concluded the trial court's careful use of limiting instructions minimized the risk of prejudice.

Finally Lilly's contention ignores the more serious potential for prejudice to plaintiffs were the two alleged joint tortfeasors tried separately. 9 Wright & Miller, *Federal Practice and Procedure* § 2389, at 290–93 elaborates:

> If plaintiff has sued two or more defendants for the same injuries, motions by the defendants that the claims against each of them be separately tried have usually been denied, *even if the basis of liability was different so that there was a possibility of confusion.* Indeed in this situation a state court, construing a rule based on Rule 42(b), held it error to grant a separate trial for each of the defendants, pointing out that "plaintiff should not, in a forced separation, be put to the hazard of two juries, each believing the absent tort-feasor the wrongdoer."

Every relevant factor thus dictates the same result. Lilly's motion for separate trial is denied.

## Conclusion

To obviate the need to leaf through this opinion for its disposition of the several motions, the results will be recapitulated here:

1. Lilly's motion to exclude post-occurrence changes in its product literature is granted as to the 1954 A-form but denied as to the 1967, 1972 and 1975 A-forms.

2. Lilly's motion to exclude cancer-related testimony is denied.*

3. University's motion to exclude colposcopic photographs is denied.

4. University's motion to exclude the Abbott Laboratories document is granted.

5. University's motion to bar Dr. Vaux from testifying as an expert witness is denied.

6. Plaintiffs' motion to exclude cumulative testimony of defendants' expert witnesses is granted. Lilly's experts will be limited as Lilly itself has most recently stated. University's experts will divide their duplicative testimony as University determines.

7. Lilly's motion for separate trial is denied.

---

* After this opinion had been prepared and typed in final form, the Illinois Supreme Court adopted a new "zone of physical danger rule" in *Rickey v. CTA,* Nos. 55962, 55963 (June 17, 1983). Though this Court has not had access to the opinion, the description in today's *Chicago Daily Law Bulletin* (not the best evidence, to be sure) indicates it would likely support the conclusions reached in this opinion.