Michael J. HENNESSY, Plaintiff,

v.

COMMONWEALTH EDISON
COMPANY, Defendant.

No. 89 C 05928.

United States District Court,
N.D. Illinois, E.D.

April 26, 1991.

Tom Leahy, Stephen Snow Phalen, and Franklin Ulyses Valderrama, Leahy & Donovan, Chicago, Ill., for plaintiff.

Frank C. Rowland, Rooks, Pitts & Poust, Chicago, Ill., Donald E. Jose, Kristine Y. Schmidt, and David Wiedis, Pepper, Hamilton & Scheetz, Philadelphia, Pa., for defendant.

## MEMORANDUM OPINION
## AND ORDER

ASPEN, District Judge:

The plaintiff, Michael J. Hennessy, has brought this three-count personal injury diversity action against the defendant, Commonwealth Edison Company ("ComEd"), for negligent infliction of emotional distress, strict liability and battery. Hennessy's claims arise as a result of receiving an internal contamination by radiation while he was working in ComEd's Dresden nuclear power station. ComEd has moved for summary judgment on all three counts of Hennessy's complaint. Hennessy in turn has moved for partial summary judgment on the question whether the doctrine of strict liability may be applied to the nuclear power industry. For the following reasons, we grant ComEd's motion for sum-

mary judgment on all three counts, and dismiss Hennessy's motion as moot.

## I. Background

At the outset, we observe that Hennessy has failed to comply with Local Rule 12(n) (formerly Rule 12(m)) of the General Rules of the Northern District of Illinois. Rule 12(n) requires a party opposing a motion for summary judgment to file a statement that responds to each numbered paragraph of the statement of material facts as to which the movant contends there is no genuine issue. Thus, in accordance with Rule 12(n), we will deem all material facts set forth in ComEd's statement to be admitted.

Rule 12(n) also requires that the opposing party file a statement, consisting of short numbered paragraphs, of any additional facts which require the denial of summary judgment. Although Hennessy has not technically complied with this requirement by filing a separate statement, he has provided a summary in his memorandum that contains additional facts with specific references to parts of the record. Therefore, we will excuse this technical requirement and will consider any additional material facts from Hennessy's summary that bear upon the propriety of summary judgment. Consideration of both parties' statements reveals the following, largely undisputed, facts.

Hennessy is a pipefitter and welder who worked for various contractors at two of ComEd's nuclear power plants from 1978–1985. Upon completing a job at ComEd's Dresden plant in 1981, Hennessy received what is known as an "exit whole body count" and several repeat counts, and was subsequently informed by a technician that he had an internal contamination of Cobalt–60. There appears to be a question, however, as to the precise date that Hennessy learned of this internal contamination. In his deposition Hennessy recalls Friday, April 3, 1981 as the date that a ComEd health physicist told him about the internal contamination. Yet Hennessy describes that day as the same day he received the exit whole body count and repeat counts on his last day of work at Dresden, which would have been in March. For the pur-

poses of ruling on ComEd's motion for summary judgment, we will accept Hennessy's recollection of April 3, 1981, as the correct date.

According to his deposition testimony, Hennessy asked questions of Dresden workers and of Nuclear Regulatory Commission officials regarding the effects of the internal contamination. He specifically spoke with the NRC on-site inspector, Tom Tongue, who told him not to worry about the internal contamination and indicated that the level was not dangerous or potentially harmful. In a phone conversation, an NRC official in Washington told Hennessy the same thing. None of these individuals, or anyone else, ever told him that he would have any ill effects physically as a result of the contamination. ComEd's health physicists told him that the contamination would ultimately leave his body through bodily secretions.

According to Hennessy, the training course he took before working at Dresden did not inform him of the possibility of internal exposure. Hennessy claims that he subsequently began to worry about the effects of the contamination based on having "read articles and things about cobalt, what it does to you." Hennessy Dep. I at 75. Hennessy has not identified any of the articles he claims to have read that gave rise to his worry. He also became concerned about the potential for contaminating his wife. He asked the various technicians and NRC officials whether he could contaminate his wife through sexual intercourse, but they did not know the answer. He claims that as a result of this, he developed a drinking problem and for a period of up to one year and a half he stopped having intercourse with his wife.

The first time that Hennessy saw a doctor after the incident was on January 18, 1982, nine months after he learned of the internal contamination. On that date, Hennessy visited his family doctor, Dr. John Siebert, complaining of upper abdominal and lower chest discomfort. Hennessy also expressed general concerns to the doctor about his radiation exposure at work, but did not specifically discuss the incident of

internal exposure. During the examination, Dr. Siebert diagnosed Hennessy as having a duodenal ulcer and treated Hennessy with medication.

Over one year later, in early 1983, Hennessy next saw Dr. Alvin Tarlov on the advise of his counsel. Dr. Tarlov examined Hennessy and conducted several tests which included a chest x-ray, electrocardiogram and pulmonary function test. Hennessy claims he never learned of the results from those tests and never saw Dr. Tarlov again. All of the test results were normal.

Four years later, on April 6, 1987, Hennessy returned to Dr. Siebert. Hennessy again complained of abdominal pain. Dr. Siebert recommended a gastroscopy due to the persistence of the ulcer in spite of the medication. A gastrologist, Dr. James Vandermeer, conducted the gastroscopy and confirmed the presence of a duodenal ulcer. At his deposition on June 6, 1990, Dr. Siebert opined that the ulcer discovered in 1987 was a recurrence of the ulcer he found in 1982. Siebert Dep. at 55, 57. He concluded, within a reasonable degree of medical certainty, that Hennessy's ulcer was caused by stress. *Id.* at 55. Based on the one instance of Hennessy complaining generally about radiation exposure eight years earlier in 1982, Dr. Siebert concluded that the source of Hennessy's stress was his concern about radiation exposure at work. Dr. Siebert explained the basis for that conclusion as follows: "I think radiation exposure is a real threat to somebody. It would be to me because probably, I don't think people know a lot about radiation exposure and a fear about the unknown is a real life thing. I think it was grinding on him is what I am trying to say." *Id.* at 55–56. Dr. Siebert acknowledged that he did not know either the magnitude or the type of radiation to which Hennessy was exposed. He recommended that Hennessy obtain further data regarding his exposure. The record on summary judgment discloses no further action by Hennessy in this regard.

Under the Code of Federal Regulations, it is permissible for a worker to inhale specified quantities of radionuclides during a given quarter of the year. The permissible quantity of Cobalt 60 (known as the "Section 103 Quantity") is 5,670 nanocuries per quarter. 10 C.F.R. § 20.103. Frazier Aff. at ¶ 50. That figure represents the quantity which would result from inhalation for 40 hours per week for 13 weeks, or a total of 520 hours per quarter, at uniform concentrations of radioactive material in the air as specified in the regulation. *Id.* On March 11, 1981, the amount of Hennessy's internal contamination was measured at 109 nanocuries. Frazier Aff. at ¶ 39.

Section 103(b)(2) provides for a "40 hour control measure" to check the rate of accumulation of the quarterly dose limit so that it can be adjusted before the Section 103 Quantity limit is exceeded:

> Whenever the intake of radioactive material by any individual exceeds this 40 hour control measure, the licensee shall make such evaluations and take such actions as are necessary to assure against recurrence. The licensee shall maintain records of such occurrences, evaluations and actions taken in a clear and readily identifiable form suitable for summary review and evaluation.

This control measure is not a dose limit, but rather serves as an interim measure to assure that the quarterly dose limit is not exceeded. Taking into account a worst case scenario of an acute exposure, an "Internal Deposition Evaluation" prepared by ComEd concluded that Mr. Hennessy's exposure did exceed the 40 hour control measure. There is no evidence that Hennessy ultimately exceeded the permissible quantity for the quarter.

According to the uncontested opinion of Dr. John R. Frazier, a ComEd witness, an internal contamination of 109 nanocuries of Cobalt–60 will give Hennessy a "50–year committed dose" of 24 millirem. That means that over the next 50 years Hennessy will receive as a result of the internal contamination, a total radiation dose to the whole body from Cobalt–60 of 24 millirems. Frazier Aff. at ¶ 9. The term "dose" is a general term denoting a quantity of radiation or energy absorbed either into matter

or persons. "Dose equivalent" is the quantity used to express the amount of effective absorbed dose resulting from radiation exposure of persons. The common unit for dose equivalent is the "rem." The term "millirem" is one one-thousandth of one rem. *See* Frazier Aff. at ¶¶ 11–16.

By contrast to the 24 millirem dose resulting from the internal contamination, a review of Hennessy's film badge records indicates that during the years 1979 through 1985, Hennessy received the following doses as a result of external contamination: 1,732 millirems in 1979, 50 millirems in 1980, 3,880 millirems in 1981, 1,470 millirems in 1982, 3,025 millirems in 1983, 3,940 millirems in 1984, and 2,092 millirems in 1985. Frazier Aff. at ¶ 35. The biological effects from an external dose to a specific organ or tissue are not different from the biological effects from an internal dose of equal magnitude to the same organ or tissue. Frazier Aff. at ¶ 28.

Hennessy claims no physical injury as a result either of his internal or his external contamination and exposures. Hennessy has stated that no one has ever told him that he presently has, or in the future may have, any physical ill effects as a result of his internal exposures. No doctor has ever told Hennessy that he has an increased risk of cancer. *Id.* at 63–65. According to the affidavit testimony of another ComEd witness, Dr. Eugene L. Saenger, Hennessy's internal 50–year committed dose of 24 millirem exposure was very small and there is no possibility of adverse biological effects from such an exposure. Saenger aff. at ¶¶ 11–12. For the purposes of comparison, Dr. Saenger indicated that Hennessy's internal contamination presents no greater risk to his health than if he would receive one chest x-ray at any time during his life. A routine chest x-ray gives the patient a dose of approximately 20 millirem. *Id.* at ¶ 13. Dr. Saenger concluded that Hennessy has suffered no acute health effects and has a zero percent chance of an increased risk of cancer or of any long term adverse health effects as a result of his internal Cobalt–60 contamination. *Id.* at ¶¶ 14–16.

The only evidence that Hennessy has submitted that might pertain to the significance of his exposure is a page from a ComEd training manual which generally describes the possible effects of both acute and chronic doses of radiation exposures:

The effect that radiation has on the body depends on how much exposure the body receives and how quickly it receives it. If we receive a large amount of radiation exposure within a short period of time (usually within a 24–hour period) it is called an *acute dose* and the effects upon the body will be actual physical symptoms.

The second type of exposure that may be received from radiation is called chronic exposure. This occurs when small amounts of radiation are received over a long period of time. This is the type of exposure that persons working at a nuclear plant incur if they work inside the controlled areas. The effects upon the body from chronic exposures are still not completely understood but it is thought that small amounts of radiation exposure over a long period of time may result in an increased risk of cancer, a shortening of life span or hereditary effects. However, the radiation doses normally received are held so low that the risk of any detectable long-term effects is much less than that from many other factors in our modern environment (smoking, obesity, etc.).

Hennessy has indicated that he does not fear future injury or cancer from any of his external doses, totalling over 16,000 millirem (16 rems), but rather suffers emotional distress as a result solely of his concern about possible future effects from the 1981 incident resulting in 24 millirems of internal radiation dose exposure. Hennessy Dep. II at 18, 20–22, 62. Each of his three claims is predicated on that single incident. Hennessy has never sought professional help or advice from any psychiatrist, psychologist, or any other counsel for his alleged emotional distress. *Id.* at 51.

## II. Negligent Infliction of Emotional Distress (Count I)

■ For a plaintiff to recover for negligently caused emotional distress in Illinois,

the defendant must have been negligent, the plaintiff must have been endangered by the negligence, and the plaintiff must have suffered physical injury or illness as a result of the emotional distress. *Siemieniec v. Lutheran General Hospital,* 117 Ill.2d 230, 111 Ill.Dec. 302, 512 N.E.2d 691 (1987); *Rickey v. Chicago Transit Authority,* 98 Ill.2d 546, 75 Ill.Dec. 211, 457 N.E.2d 1 (1983). Although the analysis of each of these elements tends to overlap in cases such as this, we shall take each in turn for the sake of clarity.

### A. Standard of Care

■ We first consider the question of negligence—whether ComEd failed to exercise due care. We observe at the outset that Hennessy has offered no evidence regarding what led to his exposure at the time in question. There is nothing in the record that would indicate whether the release of radiation and Hennessy's exposure to it was caused by an act attributable to ComEd, or whether it was the result of the carelessness of a co-worker, or even of Hennessy himself. All we know is the extent of Hennessy's contamination and exposure,[1] which may provide only a loose idea of the possible scope of the radiation release. Hennessy seeks to have us impute an act of negligence on the part of ComEd based on that fact alone. In seeking summary judgment, however, ComEd does not directly address Hennessy's failure to offer evidence concerning the causes and scope of the release of radiation leading to Hennessy's contamination and exposure. Instead, ComEd focuses on the fact that Hennessy's level of contamination and exposure was well within the permissible dose limits established by the Nuclear Regulatory Commission. That fact is significant if we, at ComEd's urging, accept that fact as undisputed and accept the federal limits as conclusive evidence of the standard of care owed to radiation workers such as Hennessy.

Hennessy first claims that, even if compliance with the federal limits satisfies the standard of care, certain of his exhibits reveal that he "did sustain a radiation contamination above the Federal limits" and "that the radioactive agent Cobalt 60 which [he] inhaled had not decayed as expected." These documents, however, do not create the issue of material fact that Hennessy posits.

Hennessy's reliance on the exhibit titled "Internal Deposition Evaluation" is misplaced because, according to the undisputed testimony of ComEd witness George Myrick, all it reveals is that Hennessy's contamination may have exceeded the "40 hour control measure." Myrick Dep. at 111; 10 C.F.R. § 20.103(b)(2). As we have described above, that control measure is not a dose limit, but rather serves as an interim measure to assure that the quarterly dose limit is not exceeded. Accordingly, we are concerned only with the quarterly dose limit in deciding whether there is evidence of a breach of a standard of care. It is undisputed that Hennessy's exposure was well within the federal permissible dose limits for the quarter. Thus, in this context, the question whether the 40 hour control measure has been exceeded is immaterial.

Hennessy additionally refers to an internal memorandum to G.A. Myrick, Rad/Chem Supervisor, entitled "Further Evaluation of M.J. Hennessy." Hennessy claims that this document creates a material issue of fact with respect to compliance with the federal standards because it discloses that the radioactive agent that Hennessy inhaled had not decayed as predicted by the standard metabolic model. Yet, Hennessy has failed to show how that fact is material to his claim. He has offered no testimony explaining any cognizable adverse affect that might be caused by the slower rate of decay. Nor has he shown how the slower rate of decay might impact

---

**1.** We do not use the terms "contamination" and "exposure" interchangeably. Contamination (or "uptake") in this context is the amount or concentration of radiation with which a person comes into direct contact, either externally or internally through ingestion. A person's level of exposure relates to the actual dose that a person may receive as a result of that contamination. *See* Myrick Dep. at 26–27, 49–50.

on Dr. Frazier's uncontested assessment of Hennessy's 50 year committed dose of 24 millirem. Thus, we have no basis for inferring anything of material significance from the fact that one follow-up evaluation showed an unexpectedly slower rate of decay of Cobalt 60. Further, ComEd has asserted that it is irrelevant whether the quantity of Cobalt 60 was not eliminated exactly in accordance with what essentially is an average predicted by the standard metabolic model. ComEd maintains that the effect mentioned in the document is simply the result of normal human variation—that which makes the concept of an. "average" in the first place. Hennessy has not even offered an unsupported countervailing explanation to refute that logic.

Having found that Hennessy failed to establish that the federal permissible dose limits were exceeded, we now consider Hennessy's contention that compliance with the federal limits should only be considered as some evidence of the standard of care, but not as conclusive proof. In support of that proposition Hennessy relies primarily on *Silkwood v. Kerr–McGee Corp.*, 485 F.Supp. 566 (W.D.Okla.1979), *aff'd in part and rev'd in part*, 667 F.2d 908 (10th Cir.1981), *rev'd*, 464 U.S. 238, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984), and *Bennett v. Mallinckrodt, Inc.*, 698 S.W.2d 854 (Mo.App.1985), *cert. denied*, 476 U.S. 1176, 106 S.Ct. 2903, 90 L.Ed.2d 989 (1986). In a recent case in this district, however, a case that presented the same issue and same objection from a plaintiff, Judge Mihm concluded that compliance with the federal limits should constitute conclusive evidence of the standard of care, rather than simply some evidence of care. *O'Connor v. Commonwealth Edison Co.*, No. 88 C 1272 (C.D.Ill. Sept. 26, 1990). In *O'Connor*, Judge Mihm carefully articulated reasons to support his holding and we find those

reasons generally persuasive. *See id.* at 6–16. Accordingly, we likewise conclude that compliance with the federal permissible dose limits, found at 10 C.F.R. § 20.103, should conclusively establish that the applicable standard of care was met in this case.

We wish to further specify, however, the precise context in which we believe evidence of compliance with these standards should be conclusively applied. The propriety of allowing tort recovery on a negligence theory based on evidence of exposures that were otherwise within the permissible federal limits was an issue that was never explicitly addressed by any of the courts on appeal in *Silkwood*.[2] Insofar as the *Silkwood* trial court's decision and the decision in *Mallinckrodt* may be read to allow recovery under state law based simply on evidence of a level of exposure less than that permitted by federal regulations, we respectfully disagree with those decisions.[3]

■ Although a state law *remedy* is not foreclosed by the federal regulations, the U.S. Supreme Court has declared, in essence, that states are precluded from regulating the safety aspects of nuclear development and of the handling of hazardous nuclear materials. *Pacific Gas & Electric Co. v. State Energy Resources Conservation & Development Comm.*, 461 U.S. 190, 211–112, 103 S.Ct. 1713, 1726, 75 L.Ed.2d 752 (1983). In *Mallinckrodt* the court itself acknowledged that this prohibition "is premised on Congress' belief that the NRC is more qualified than the individual states to determine what type of safety standards should be enacted in this complex area." 698 S.W.2d at 858 (citing *Silkwood*, 104 S.Ct. at 622). Yet, the court in *Mallinckrodt* went on to hold that the federal limits were only "guidelines," not preemptive lim-

---

**2.** In *Silkwood,* the Tenth Circuit found that the plaintiff's claims for personal injury was barred by a workers compensation statute and upheld the claim for property damage on a strict liability theory. 667 F.2d at 915–21. Therefore, the court did not address the negligence standard of care with respect to the amount of permissible exposure.

**3.** As we more fully discuss, *infra,* a different case might be presented when there is proof of an accidental or intentional release of radiation in such an amount and under such circumstances to pose an unreasonable risk of injury to persons. We reiterate that no such evidence exists in the record before us. All we have to go on is the resulting amount of Hennessy's exposure.

its, based on the prefatory language of 10 C.F.R. § 20.1(c) which provides: "In accordance with recommendations of the Federal Radiation Council ... [licensees] should, in addition to complying with the requirements set forth in this part, make every reasonable effort to maintain radiation exposures ... as low as is reasonably achievable." We do not read this language, however, as opening the door to the states to fashion more stringent standards of permissible exposure levels through their tort system.

■ At best, this language supports the proposition that under a standard of due care that is predicated on the federal regulations, liability may attach in the event a licensee has failed to make every reasonable effort to maintain radiation exposures as low as is reasonably achievable. That proposition cannot usefully be applied in the evidentiary posture that this case presents because there is no adequate evidence tending to show that ComEd failed to make the effort required by the preamble. *Cf. Silkwood*, 485 F.Supp. at 586 (witness testified that defendant was not conforming to the "as low as reasonably achievable" standard). The mere fact of one exposure that was well within the federally proscribed limits—all the evidence we have here—is too speculative a basis upon which to make that determination.

■ To clarify this point, we acknowledge that simply because Hennessy's measurable radiation exposure may have been within the permissible limit does not necessarily mean that ComEd was safely and reasonably controlling its releases and the exposure of its workers in accordance with the "as low as reasonably achievable" standard. We can safely assume that keeping exposures as low as reasonably achievable is a function of the care used in controlling the release of radiation and how long a particular individual is stationed in the area of any release. The level of exposure of any particular worker is simply one way of assessing, after the fact, the efficacy of whatever procedures might be in place to meet the standard. Exposure levels therefore simply provide evidence of whether the standard is met. Thus, one could imagine a worker, Worker A, being in an area for an inordinate period during which time an exceptionally hazardous release of radiation occurred as a result of the sloppy and careless procedures in place at a particular utility. Absent evidence as to how much radiation was in fact released and precisely how long the utility kept Worker A in the dangerous area, we would need to rely on inferential evidence in order to find a breach of due care. Under the circumstances described, we might expect that Worker A would have sustained an exposure level well in excess of the federally prescribed limits. In such an instance, a factfinder could reasonably infer that the utility was not exercising the level of safety mandated by the regulations, since an excess exposure level in a worker is clear evidence that something was not being done right. Thus, evidence of a lack of compliance with the federal levels would create a triable issue of fact.

■ Suppose, however, that the only evidence we had to rely on was the exposure level of Worker B, who fortuitously left the scene prior to the release and whose exposure level, we shall assume, fell well within the federal limits. Absent additional evidence, Worker B's exposure level does not provide enough information upon which to infer either that the utility was negligent or was not negligent. Workers who are employed in safely operating plants are expected to have exposures well within the permissible limits. On the other hand, as our example illustrates, simply because a particular worker shows an exposure well within the federal limits does not mean that the utility was operating safely and was not using its best efforts to keep levels down—with respect to Worker A, the utility had most likely breached its standard of care by placing him in a situation in which he attained an exposure level that exceeded the federal limits. Yet, if Worker B brings a claim arising solely out of the circumstances giving rise to his own exposure and based only upon evidence of an exposure level that was within the federal limits, as is the case here, there is no basis for con-

cluding that the utility breached its duty of care to Worker B. It is under these circumstances that we conclude that compliance with the federal permissible dose limits found at 10 C.F.R. § 20.103 should serve as conclusive evidence of the standard of care being met, simply by virtue of the fact that evidence which only reveals an exposure within the limits is entirely inconclusive.

Nevertheless, even were we to agree with Hennessy that compliance with the NRC exposure levels should not be regarded as conclusive evidence of ComEd's exercise of reasonable care, it is not enough for Hennessy simply to cite caselaw that he claims establishes a cause of action based on levels of exposure less than the federal limits. Hennessy must establish what a lesser level of exposure should be and then adduce evidence tending to show that the level was exceeded. The only evidence offered by Hennessy that relates in any way to a proposed level of safe exposure is the page from a ComEd training manual which generally describes the possible effects of both chronic and acute radiation exposures.[4] Pl.Ex. D. Hennessy relies on a passage regarding chronic exposure in an attempt to rebut the contention that the federal limits provide an acceptable standard below which any significant effects from radiation exposure will not be found: "The effects upon the body from chronic exposures are still not completely understood but it is thought that small amounts of radiation over a long period of time may result in an increased risk of cancer, a shortening of life span or heredity effects." We first observe, however, that this particular passage speaks only in general terms and provides no basis for relating the specific amount of Hennessy's radiation exposure to risks that the passage describes. Furthermore, Hennessy has clearly stated that he is not concerned with his cumulative exposures, but is only concerned with the single incident of "worst case" acute exposure detected on March 11, 1981. The training document defines an acute dose as a "High Dose over a short period of time (usually one day)." When assessing actual numbers to its discussion, the training document indicates that only an acute dose of greater than 100,000 millirem would probably result in significant effects. Thus, it suggests a permissible level of exposure that actually far exceeds the federal limits.

■ Hennessy does not propose any other measure of acceptable dose limits as reflecting a level of due care with respect to the release of radiation. Yet, even if we infer that Hennessy means to suggest that there is no level of safety—a zero exposure standard—Hennessy has failed to adduce any evidence that supports the concept of a zero exposure standard as a level of due care. In other words, we have before us no evidence that even remotely suggests that any amount of radiation, let alone the amount of radiation to which Hennessy was exposed or might have been exposed had any significant possibility of harming him. *Cf. Silkwood,* 464 U.S. at 275 n. 2, 104 S.Ct. at 635 n. 2 (Powell, J. dissenting) (plaintiff produced an expert who testified that the amount of plutonium contamination plaintiff experienced might have manifested itself in the form of lung cancer and chromosome damage at some later date).[5] Thus, it is impossible for us to hold that the release of radiation leading to his exposure violated due care.

Accordingly, based on the record on summary judgment, it remains undisputed that Hennessy did not sustain an exposure to radiation or otherwise adduce evidence that would indicate a release of radiation that exceeded any pertinent standard of care.

4. There is no contention that this manual is one that Hennessy read. It is offered only on the question regarding the effects of radiation exposure on individuals.

5. Since *Mallinckrodt* was decided on a motion to dismiss, the case had not reached the evidentiary stage and therefore does not provide even tangential support for the factual proposition that Hennessy would have us infer. We further are at a loss to uncover the "plethora" of scientific authority that Hennessy claims he has provided in support of a zero threshold level of exposure.

## B. Endangerment

■ The typical emotional distress case involves a party narrowly escaping injury from an event that has just occurred—the so-called "zone of danger" cases. *See, e.g., Rickey,* 98 Ill.2d at 555, 75 Ill.Dec. at 215, 457 N.E.2d at 5 (plaintiff must have been in "such proximity to the accident" that there was "high risk of physical impact" so as to cause the plaintiff "reasonable fear for his own safety"). In such cases, if there was little or no chance of the plaintiff actually being injured, the plaintiff cannot have been endangered by the conduct. If the plaintiff was not endangered, then any resulting emotional distress, even if real, must be considered unreasonable, and hence unactionable. In other words, the plaintiff had nothing actually to be afraid of in the first instance. The endangerment element therefore provides a framework for deciding whether a plaintiff's emotional distress may be attributable to a reasonable fear of harm arising from a negligent occurrence or simply to paranoia on the part of the plaintiff, a situation that the creation of a cause of action for negligent infliction of emotional distress was not designed to redress. *See Knierim v. Izzo,* 22 Ill.2d 73, 85, 174 N.E.2d 157, 164 (1966).

■ Hennessy's emotional distress derives from a fear of cancer or other illness allegedly associated with the radiation exposure he received. *Cf. Hagerty v. L & L Marine Services, Inc.,* 788 F.2d 315, 317 (5th Cir.1986) (finding that the present fear or anxiety due to the possibility of contracting cancer constitutes a present fact of mental anguish). Although often treated as distinct doctrinal category, fear of cancer claims effectively comprise a particular subset of emotional distress claims in general. *See id.* at 318. On the issue of endangerment, the distinction between the typical emotional distress claim and a fear of cancer claim is simply a temporal one. As we have observed, the typical case is concerned with whether there was a significant possibility that plaintiff could have been injured by the negligent occurrence. Thus, the inquiry requires an after-the-fact consideration of what could have happened to a plaintiff who is presently no longer at risk of injury. By contrast, because fear of cancer claims usually arise from direct exposure to substances with latent disease-producing effects, such claims require a prospective inquiry as to whether the plaintiff is at risk of suffering any consequences in the future. Both inquiries are geared toward assessing whether a plaintiff's claimed distress is reasonable.[6] *Lewis v. Westinghouse Elec. Corp.,* 139 Ill. App.3d 634, 636, 94 Ill.Dec. 194, 195, 487 N.E.2d 1071, 1072 (1st Dist.1985). "Whether a fear is reasonable is determined by the objective standard of whether a particular incident would produce fear in the person of ordinary sensibilities." *Id.*

In applying these principles on summary judgment to the facts of this case, we must first consider Hennessy's objection to ComEd's assertion that the question as to whether a fear is reasonable is a question of law and not a question fact. ComEd points out that a majority of the appellate panel in *Lewis* expressly held that the question is to be decided as a matter of law. *See id.* at 636–37, 94 Ill.Dec. at 196, 487 N.E.2d at 1073. Relying upon the dissenting opinion in *Lewis,* however, Hennessy asks us to reject the *Lewis* majority view as a misreading of the Illinois Supreme Court opinion in *Knierim,* 22 Ill.2d 73, 174 N.E.2d 157. Hennessy's argument is not without merit, particularly since the question of reasonableness may be viewed as an aspect of proximate cause. *Cf.*

---

**6.** A hybrid example would arise if, in the hypothetical situation discussed in the previous section, Worker B brought an emotional distress claim based on narrowly escaping the incident that led to the dangerously excessive exposure of Worker A. In such a case, we would have to assess first whether Worker B was in the "zone of danger" of being exposed to the radiation and then whether his distress at being nearly exposed was reasonable in light of the likelihood of sustaining a latent injury had he in fact been so exposed. We point out that this scenario presents a situation in which Worker B might find redress for his distress even if his personal exposure level fell well within the federal limits. In such a case, however, there must also be evidence that the utility created a situation in which the federal exposure levels either were exceeded as to others or were likely to have been exceeded with respect to Worker B.

*Wetherill v. University of Chicago,* 565 F.Supp. 1553 (N.D.Ill.1983) (reserving issue of reasonableness of fear for jury to decide). Nevertheless, we need not specifically decide the issue, because even if we treat the matter as one properly for the jury to decide, Hennessy has failed to adduce evidence which, when viewed in the light most favorable to him, would give rise to a triable issue of fact.[7]

As evidence of the reasonableness of his fear, Hennessy claims to have read articles that informed him of the possible adverse consequences of exposure to radiation. Notwithstanding the overwhelming lack of specificity to this evidence, we acknowledge that there can be no doubt that it has been widely reported and is widely accepted that increased exposure to radiation yields an increased risk of contracting cancer. To establish the reasonableness of his distress, however, Hennessy must show something more than a general awareness of the risk of contracting cancer as a result of exposure to radiation. He must adduce evidence tending to show that he actually experienced a particular event that placed him at risk, an event from which there appeared to be a real chance that he might come to harm.

Hennessy's claim is based solely on the internal radiation exposure he personally sustained.[8] Hennessy has come forward with no competent evidence to provide a reasonable basis for his apprehension that the level of internal contamination he' received would be expected to have any significant adverse effect upon him in his lifetime.[9] No one has ever told Hennessy that he presently has, or in the future may have, some ill effects physically as a result of his internal contamination. No doctor has ever told him that he has an increased risk of cancer. In fact, Hennessy was specifically told that he was not at risk; his fear derives from his decision not to believe what he was told.[10] His decision to disregard what he was told might be discounted if there was evidence to suggest that statement was untrue, but Hennessy has come forward with no such evidence.

In light of this, Hennessy ultimately relies on a claim of ignorance as the basis upon which his fear should be deemed reasonable. He maintains that he is not a health physicist, and therefore cannot be expected to understand the relative insignificance of his internal exposure.[11] However, while such naivete concerning the actual ramifications of his internal exposure may make Hennessy's fears subjectively understandable, it does not provide a basis for finding his fears objectively reasonable. We are sympathetic to Hennessy's concerns about the potential dangers of working in his trade, as was Dr. Siebert. In addition, we can fully understand Hennessy's confusion as to the significance of the particular episode of internal exposure.

7. Because of the dearth of evidence on the issue, we also need not decide what degree of risk of future injury would be adequate to support an inference in favor of Hennessy as to the reasonableness of his fear. *See, e.g., Wetherill,* 565 F.Supp. at 1559 ("fears of future injury can be reasonable even where the likelihood of such injury is low").

8. As we noted above in footnote 7, Hennessy might also have shown that the events giving rise to his exposure placed him at a significant risk of exceeding his exposure level, albeit a risk that ultimately did not materialize. Hennessy does not base his claim on such a circumstance.

9. The cases to which he cites are not evidence, and were based upon their own factual record.

10. Though it is truly unfortunate that the officials could not tell Hennessy whether it was possible that he could contaminate his wife, that circumstance is not material to question as to whether Hennessy possesses a viable claim for fear of cancer. Hennessy does not claim that his emotional distress derives from the outrageous conduct of ComEd or any of its employees—a doctrinally distinct basis for recovery of emotional distress.

11. Based on the same reasoning, Hennessy objects to ComEd's assertion that his claim of distress should be discounted by the fact that he is not concerned about the many external exposures he sustained, since he is not aware that the effects of an internal exposure are the same as those from external exposures. ComEd further points that Hennessy continued to work at its nuclear power plants after he learned of his internal contamination. These matters more directly pertain to whether Hennessy's distress is credible. Assuming his distress is real, they do not directly shed light on whether he is being reasonable in fearing for his own well-being.

Radiation poses a troubling ethereal threat, and it is likely that radiation monitoring is a mysterious matter to the uninformed. Yet, absent a basis in fact that would support Hennessy's fear that he either was or will be at risk for cancer as a result of the episode of internal contamination, such a belief founders on pure speculation, and hence cannot be said to be reasonable. In sum, the record on summary judgment discloses that Hennessy had no tangible reason to believe he was actually endangered by the incident.

### C. Physical Manifestation of Distress

■ For the sake of completeness, we find the evidence sufficient to create an issue of fact as to whether Hennessy has manifested physical symptoms resulting from the distress. Dr. Siebert has loosely related Hennessy's duodenal ulcer to his alleged emotional distress. Although creating an issue of fact, we observe that this evidence is quite weak. Dr. Siebert did not directly relate the ulcer to Hennessy's concern about the single exposure giving rise to Hennessy's complaint, but rather, Dr. Siebert relates the ulcer to Hennessy's concern about the potential for radiation exposure at work in general. That testimony would tend to dilute any claim by Hennessy that the particular incident in question was the sole cause of his distress.

### D. Increased Risk of Cancer

Within his count for negligent infliction of emotional distress, Hennessy also seeks to recover for an increased risk of cancer. Such a claim is usually viewed as an element of damages arising from some other tort, and not a claim in and of itself. Thus, ComEd maintains that in order to recover damages for an increased risk of future injury, Hennessy must prove a present physical injury and that the claimed future injury is reasonably certain to occur. In responding to this, Hennessy confuses the difference between a claim for fear of cancer and a claim for increased risk of cancer. We need not address this matter in any detail, however, because as we have already found, Hennessy has failed to adduce any evidence to support the allegation that he is at any increased risk of harm as a result of this episode.

Accordingly, we grant summary judgment in favor of ComEd on Count I.

### III. Strict Liability (Count II)

■ Hennessy next seeks to hold ComEd strictly liable for his alleged injury, increased risk of cancer, and fear of future injury. Hennessy spends the greater portion of his memorandum in response discussing whether the nuclear industry is subject to strict liability under Illinois law and whether assumption of risk is a viable defense. In addition to his response, Hennessy has filed a motion for partial summary judgment on the question whether ComEd may be held strictly liable for its activities. We need not decide this question, however, because Hennessy's strict liability claim fails for a more fundamental reason.

Even assuming ComEd is otherwise subject to strict liability in tort for its operation of the nuclear power plant, an essential element of a claim for strict liability is a physical injury to the plaintiff. *Mink v. University of Chicago*, 460 F.Supp. 713, 719 (N.D.Ill.1978). Hennessy has failed to establish even an inference of present physical injury that is causally related to the internal contamination that he received in March 1981. The only physical illness about which Hennessy complains is the ulcer. Hennessy has adduced no evidence tending to show that any amount of radiation exposure, let alone the amount to which Hennessy was exposed, can directly cause an ulcer. As far as the record of this case is concerned, the ulcer is at best only a manifestation of Hennessy's alleged emotional distress over receiving an internal contamination. As such, the ulcer does not satisfy the present physical injury requirement.[12]

---

12. Indeed, if emotional distress alone was sufficient to create a causal link between Hennessy's exposure and the ulcer such that the ulcer would be regarded as "present physical injury," then the relaxation of the physical injury requirement occasioned by the development of a cause of action in negligence for emotional distress would not have been required.

Even if we read Hennessy's responsive memorandum as suggesting that the principles of strict liability should be extended to claims for emotional distress, a question that is distinct from the question whether strict liability may be imposed against the nuclear industry for actual injuries that result from radiation exposure, Hennessy's strict liability claim fails. First of all, Hennessy has pointed to no Illinois authority in support of such a proposition. Nor has Hennessy advanced a substantive legal argument in favor of a such a holding. Thus, Hennessy has failed to properly advance the issue.

Furthermore, even if we acknowledge that a claim for emotional distress under strict liability is supportable in theory,[13] for all the reasons discussed above, Hennessy nevertheless has failed to establish the reasonableness of his emotional distress. Accordingly, we grant summary judgment in favor of ComEd on Count II, and deny Hennessy's motion for partial summary judgment as moot.

### IV. Battery (Count III)

Finally, Hennessy's claim of battery also fails on summary judgment. In order to prove a battery, Hennessy must establish that ComEd committed intentional acts resulting in offensive contact with Hennessy's person, and that Hennessy did not consent to such conduct. *Mink*, 460 F.Supp. at 718. Even assuming Hennessy did not consent to being exposed to the amount of radiation at issue in this case, an assertion almost conclusively belied by his knowing and continued exposures to and receipt of doses of radiation significantly greater than the amount at issue here, Hennessy has failed to offer any evidence showing or that would tend to show that

ComEd intended to cause Hennessy to suffer the contact at issue. The record on summary judgment is bereft of any facts or explanation regarding what event led to Hennessy's contamination. Thus, it would be pure speculation to suppose that ComEd either engineered a radiation release or knew that a radiation release was substantially likely to occur in Hennessy's work area in an amount and manner that would cause the internal contamination. Accordingly, we grant summary judgment in favor of ComEd on Count III.

### V. Conclusion

We grant summary judgment in favor of ComEd on all three counts of Hennessy's complaint. Hennessy's motion for summary judgment is dismissed as moot. It is so ordered.

---

**13.** The policies supporting the cause of action for emotional distress in negligence would appear to equally justify its imposition under strict liability, so long as the other requisites of a strict liability claim have been satisfied. Emotional distress claims, when coupled with a physical manifestation of the distress, present a reliable and nonspeculative basis upon which to impose damages resulting from tortious conduct and therefore insure that tortfeasors bear the direct and measurable costs of that conduct. *Cf. Hagerty*, 788 F.2d 315 (5th Cir.1986) (absent

physical injury, damages allowed for mental distress and reasonable costs of medical check-ups for cancer); *Ayers v. Jackson Township*, 106 N.J. 557, 605–606, 525 A.2d 287, 312 (1987) (same, damages allowed for medical monitoring); Comment, *Recovery for Risk Comes of Age: Asbestos in Schools and the Duty to Abate a Latent Environmental Cancer*, 83 Nw. U.L.Rev. 512 (Fall 1988/Winter 1989) (arguing abatement costs provide an appropriate measure of recovery in the absence of present physical harm).